FILED

98 SEP -2 AM 8: 09

U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LINDA J. WILLIAMS,                )
                                  )
        Plaintiff,                )
                                  )
vs.                               )     Civil Action No. CV-97-S-2036-S
                                  )
BIG LOTS; and CONSOLIDATED        )
STORES CORPORATION,               )
                                  )
        Defendants.               )

ENTERED

SEP - 2 1998

### MEMORANDUM OPINION

Plaintiff, Linda J. Williams, was hired on August 29, 1995, to work as a temporary part-time sales associate at the "Big Lots" department store located at the "Village East" shopping center in Birmingham, Alabama. (Jorja Williams Deposition at 13.) Defendant, Consolidated Stores Corporation, is an Ohio corporation that owns and operates Big Lots stores nationwide, including the Village East retail outlet. Plaintiff was given a "regular" sales position as cashier on January 14, 1996. (*Id.* Exhibit 18.) Her immediate supervisors were Michelle Gaines and Charlene Taylor, customer service supervisors.[1] (Gaines Deposition at 8; Taylor Deposition at 9-10.) In turn, Gaines and Taylor were supervised by assistant manager Patrick Riels, who began working at Big Lots' Village East store on May 15, 1996.

---

[1] The position is sometimes referred to as "customer service specialist." (*See* Taylor Deposition at 8.)

43

## A.  Sexual Harassment

Plaintiff alleges Patrick Riels told sexually oriented jokes on a daily basis.  Plaintiff contends Riels related such jokes either directly to her, or to other employees in her presence, and that nothing was done to stop his offensive behavior.  Michelle Gaines, plaintiff's immediate supervisor, testified that she witnessed such conduct two or three times each day.  (Gaines Deposition at 11.)  Gaines further testified that some cashiers laughed at Riels' jokes, while others, including herself, found the jokes offensive and walked away when Riels began telling them. (Id. at 11-12.)

Riels also allegedly subjected plaintiff to five other instances of sexual harassment between July and August of 1996.

### 1.  First incident

Plaintiff alleges the first incident of sexual harassment occurred in mid-July, 1996.  Plaintiff said she entered an enclosed toilet in the women's restroom at Big Lots and noticed a man's shoes in the stall adjacent to hers.  She asked, "who is that?" When Riels identified himself, plaintiff ran out of the restroom; she "didn't wait to hear what he had to say.  [She] just got out." (Plaintiff's Deposition at 88-89.)  Plaintiff does not allege that Riels made any rude, offensive, or sexually charged comments while in the adjacent stall, however.  (Id.)  Plaintiff nevertheless immediately reported the incident to her supervisor, Michelle

2

Gaines. (*Id.* at 35.) Gaines testified that the men's restroom was out-of-order at the time of the incident. (Gaines Deposition at 37.)

### 2. Second incident

Plaintiff, Michelle Gaines, and another cashier, Vera Brown, were standing at the service desk counting money on August 4, 1996. Riels walked up behind plaintiff and "his front part hit [her] back part and he said, wow, that was thrilling." (Plaintiff's Deposition at 93-94.) Plaintiff testified that, following the encounter,

A.   ... Riels just looked like he kept bumping up to me, like he wanted to touch me, you know, just kept bumping into me without saying excuse me or anything.

Q.   Did he touch you with his hands?

A.   As he bumped he did, yes.

(*Id.* at 96.)

### 3. Third incident

During August of 1996, plaintiff returned for credit a neck and shoulder massager she had previously purchased from Big Lots. Riels noticed the massager and asked plaintiff if it was a "boyfriend in the box." (Plaintiff's Affidavit ¶ 16; Gaines Deposition at 13-14, 18-19.)

### 4. Fourth incident

Plaintiff alleges that Riels deliberately reached in front of her as she stood at the service desk, in a manner that would bring

3

her lower body into contact with him.  Although Riels appeared to

be reaching for something under the counter, he never actually

retrieved anything.  Plaintiff stepped back, out of Riels' way each

time that he reached in front of her, thereby avoiding actual

contact.  (Plaintiff's Affidavit ¶ 19.)

    5.  Fifth incident

    Plaintiff testified that Riels implied that he wanted sexual

favors in exchange for permitting her to purchase a package of

diapers then on sale at the store:

> When I walked in from work, Michelle Gaines was standing
> up there at the service desk.  The Pampers was on - at
> the service desk on top of the desk.  I said, oh, they
> got some Pampers on sale.  It was a big quantity and I
> said, oh, on sale for five dollars and something.    I
> said, Michelle, where are these Pampers at?  She said, I
> don't know, she said, Patrick brought them up and put
> them up on the service desk for his wife to buy.  She
> said, go over there and look where we keep the Pampers at
> and see if there's any more over there.  I said, Michelle
> I don't see any more.  She said ask Patrick about it
> because he's the one that put them up there.  So Patrick
> came down and I asked Patrick, I said where are these
> Pampers at?  I would like to get my niece some of those.
> He said <u>I might give you some if you be nice to me</u>.   I
> was like, be nicer to me.  I should be nicer to you, <u>how</u>
> <u>nice do you want me to be</u>?  And he said, <u>nicer than you</u>
> <u>have been honey</u>.

(Plaintiff's Deposition at 114 (emphasis supplied).)   Plaintiff

interpreted those remarks to mean "he wants me to have sex or let

him do whatever he wants with me I guess."  (*Id.* at 115.) Plaintiff

concedes, however, that no explicit solicitations or requests for

sexual favors were made to her by Riels.  (*Id.* at 114-15.)  Gaines

overheard the remarks, and also attributed a sexual connotation to

4

them, primarily because of Riels' earlier conduct towards plaintiff. (Gaines Deposition at 25.)

Plaintiff complained to her immediate supervisors, Gaines and Taylor, about Riels' conduct, and asked that she not be scheduled to work with him again. (Plaintiff's Deposition at 141; Gaines Deposition at 15-18; Taylor Deposition at 18-19.) Neither Taylor nor Gaines had authority to grant that request, but Gaines conveyed plaintiff's complaints to Robert Harder, the store manager, on at least two occasions. (Gaines Deposition at 15-18, 27-28.) The first time Gaines asked Harder to transfer plaintiff away from Riels, Harder allegedly "just smiled and sa[id] there's nothing he [Harder] could do. She [plaintiff] ha[s] to work." (Id. at 16.) The second time Gaines requested that plaintiff be transferred to another shift, Harder had the same response: "he just smiled and shook his head." (Id. at 18.) Harder took no action, and plaintiff continued to be scheduled to work the same shift as Riels.

After her complaints to Gaines and Taylor had no effect, plaintiff took her complaints to Stephanie McGee, a new assistant manager, on August 19, 1996. McGee notified Harder, who telephoned Jorja Williams, Big Lots' regional human resources manager. (Plaintiff's Deposition at 119-21; Harder Affidavit.) Williams initiated an investigation into Riels' conduct, and on August 21,

5

1996, arrived at the store to conduct interviews into the matter.
(Harder Affidavit.)

Jorja Williams later testified that plaintiff was the only
employee ever to lodge a complaint against Riels during his
employment with "Big Lots." (J. Williams Deposition at 80; Robert
Harder Affidavit.)    Williams personally concluded that Riels'
conduct did not constitute sexual harassment.    (J. Williams
Deposition at 34-35.)

Nevertheless, based upon Williams' investigation, Riels'
employment was terminated on August 30, 1996.  (*Id.* at 102, 107.)
The progressive counseling form issued to Riels' upon his
termination states:

> An investigation was conducted at [store] #363 in a
> response to a claim of sexual harassment filed against
> Patrick Riels.  It has been determined that Mr. Reils
> [sic] has made inappropriate remarks of a sexual nature
> to female associates.  It has also been verified that Mr.
> Riels frequently tells jokes of a sexual nature to the
> female cashiers at the front of the store.
>
> Mr. Riels is a member of management responsible for
> enforcing the policies of the company.  He is expected to
> conduct himself in a professional manner.  Relating jokes
> and making comments of a sexual nature, regardless of
> intent, is completely unacceptable.  This conduct may be
> offensive and unwelcome to some associates and is
> prohibited by the company's Harassment and Standards of
> Conduct Policies.

(Defendant's Exhibit 21.)

6

Defendant[2] has an "Open Door Policy," which outlines for employees the steps to take in order to voice concerns or complaints.

> Step 1: Take the question or concern to your immediate supervisor or manager.
>
> Step 2: If you still have a question, go to the next level of manager.
>
> Step 3: If you still have a question or you just feel uncomfortable discussing the issue with one of the managers listed above, contact the appropriate member of the Human Resources Department.

(Defendant's Exhibit 4.) Plaintiff concedes she used the Open Door Policy twice, to address complaints about her working conditions. Both occasions were during July of 1996, and each time she spoke with Jorja Williams. (Plaintiff's Deposition at 156-165; J. Williams Deposition at 83-92.)

On August 21, 1996, Jorja Williams announced that the Village East store would close during November of 1996. (J. Williams Deposition at 113.) Williams conducted a meeting among all employees, and explained defendant's policy regarding closeout sales, which included restrictions on employee purchases during the closeout. (Id.) Defendant planned to begin closing the Village East store shortly after the meeting. During the closeout period,

---

[2] Plaintiff sued two defendants in her complaint. However, in view of the fact that Consolidated Stores Corporation owns and operates all stores conducting retail business under the name "Big Lots," this court will treat the named defendants as constituting but one party. Hence, the use of the singular designation "defendant."

7

"the whole store goes on sale" with the merchandise being regularly reduced.  (Id. at 114-116.)

Defendant has a policy of issuing "progressive counseling forms" as disciplinary action for violations of company policy. (Defendant's Exhibit 5.)  Plaintiff received two such forms for violating company policy regarding employee purchases during a closeout sale.[3]   (J. Williams Deposition at 113.)  Receipt of a progressive counseling form during the closeout period may result in the employee's termination.   (Id. at 19.)   Plaintiff was suspended pending an investigation of the violations.  (Plaintiff's Deposition at 204; J. Williams Deposition at 81-82.)  Plaintiff was subsequently terminated on October 15, 1996.  (Defendant's Exhibit 7.)

Plaintiff's supervisor, Taylor, testified other employees and managers processed their own purchases at the store without getting written up or terminated.  (Taylor Deposition at 31.)  Plaintiff

---

[3] Plaintiff's first progressive counseling form, dated September 18, 1996, was issued after she was observed on video tape holding merchandise for future purchase.  Plaintiff's action violated the Standards of Conduct Policy which reads:

> Associates are not permitted to hold merchandise for purchase at a later time.  Associates may not purchase merchandise unless it is available for sale to the general public.  Associates may not purchase ad/event merchandise prior to the ad date without approval of their supervisor.

(Plaintiff's Deposition; Defendant's Exhibit 18 at 25.)

Plaintiff's second progressive counseling form, issued on October 4, 1996, resulted from her attempting to take advantage of an in-store promotional discount on a stereo/CD player during working hours.  According to defendant, plaintiff's action violated three different company policies: (1) making purchases while on the clock; (2) failing to obtain approval for a check over the amount of $25.00; and, (3) associate ringing in his or her own sale. (Plaintiff's Deposition; Defendant's Exhibit 18 at 125, 204.)

8

also presented evidence Harder began falsifying problems with plaintiff in order to have her fired after she complained of the harassment and filed her EEOC charge. (*Id.* at 33-37.)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 28, 1996. (Defendant's Exhibits 6 and 7.) Following receipt of her right to sue notice, plaintiff commenced this action on August 5, 1997. She alleges defendant discriminated against her because of her sex by subjecting her to (a) *quid pro quo* sexual harassment, (b) a sexually hostile work environment, and (c) retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* Plaintiff also pleads a single pendent state law claim against defendants for negligent supervision and retention. Defendant moves for summary judgment as to all claims. This action now is before the court on the following motions:  defendant's motion for summary judgment; plaintiff's amended motion for partial summary judgment; and, defendant's motion to strike. Each will be addressed in turn.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

9

is entitled to judgment as a matter of law." "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its burden, "the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

10

"'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

## II. DISCUSSION

Title VII "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981)(citations omitted). The EEOC has provided guidelines for determining sexual harassment. These guidelines state "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(1981).

11

## A. Quid Pro Quo Sexual Harassment

"*Quid pro quo* sexual harassment occurs when an employer changes an employee's conditions of employment because of ... refusal to submit to sexual demands." *Virgo v. Riviera Beach Associates, Ltd.,* 30 F.3d 1350, 1362 (11th Cir. 1994)(citing *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1315 (11th Cir. 1989)). In order to establish a *prima facie* violation of Title VII on grounds of *quid pro quo* sexual harassment, an employee must prove five elements:  (1)  the employee belongs to a protected group;  (2)  the employee was subjected to unwelcome sexual harassment;  (3)  the harassment complained of was based upon sex; (4)  the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5)  *respondeat superior.*    *Henson,* 682 F.2d at 908.    Defendant argues that plaintiff was not subjected to a sexual demand, and even if she was, no term of employment was conditioned on her acquiescence to such a demand.

"The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Anderson v. S.U.N.Y. Health Science Center at Syracuse,* 826 F. Supp. 625, 629 (N.D.N.Y. 1993) (quoting *Carrero v. New York City Housing Authority,* 890 F.2d 569, 579 (2d Cir. 1989)

12

(emphasis supplied). In *Anderson*, the court found the employee failed to show that his economic status was altered. The court based its finding on the fact the employee was "not demoted, passed over for a promotion, suspended, laid-off, or discharged as a direct result" of the supervisors evaluations following the alleged sexual harassment. *Id.*

"[A] blatant request for sexual favors is not necessary to establish a claim of *quid pro quo* harassment." *Morrow v. Auburn University at Montgomery,* 973 F. Supp. 1392, 1403 n.41 (M.D. Ala. 1997). Nevertheless, there should be a reasonable "verbal/temporal" relationship between the offensive conduct and discussion of the employee's job benefit or detriment. *See Morrow,* 973 F. Supp. at 1403 (quoting *Fowler v. Sunrise Carpet Industries, Inc.,* 911 F. Supp. 1560, 1578 (N.D. Ga. 1996)). Even so, the Sixth Circuit has said "there may be a *de minimis* exception for temporary actions ... or where further remedial action is moot and no economic loss occurred." *Kauffman v. Allied Signal Inc., Autolite Division,* 970 F.2d 178 (6th Cir. 1992).

Plaintiff has alleged (and presented evidence of) only one act by Riels that could even arguably be construed as a sexual demand: the incident in which he refused to tell her where the discounted diapers were located, unless she was "nicer" to him. Plaintiff does concede, however, that no explicit solicitations or requests for sexual favors were made to her by Riels. Plaintiff contends

13

the right to exercise her employee discount on a box of diapers was the tangible job benefit effected by her refusal to Riels' sexual advance. Plaintiff's argument is without merit. This court agrees with the Sixth Circuit statement of the possibility of a *de minimis* exception to *quid pro quo* claims.

One comment made to plaintiff by Riels, effecting only her right to obtain a discount on a $5.00 package of baby diapers, does not rise to the level of tangible job detriment supporting a *quid pro quo* claim. Accordingly, defendant's motion for summary judgment as to plaintiff's *quid pro quo* claim is due to be granted.

**B.   Sexually Hostile Work Environment**

A plaintiff also can establish a violation of Title VII by proving that sexual harassment has created a hostile or abusive work environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). The Supreme Court, in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-71, 126 L.Ed.2d 295 (1993), held that "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find  hostile or abusive, and one that the victim in fact did perceive to be so." Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive

14

environment." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, [it] is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (citing *Vinson*, 477 U.S. at 65, 67, 106 S.Ct. at 2405) (internal quotation marks omitted).

The five elements of a *prima facie* Title VII claim for hostile work environment sexual harassment are: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon the employee's sex; (4) the harassment complained of affected a "term, condition, or privilege" of employment, in that it was "sufficiently severe or pervasive to alter the condition of [the victim's] employment and create an abusive working environment;" and (5) *respondeat superior*. *Henson*, 682 F.2d at 903-905; *Martin v. Norfolk Southern Railway Company*, 926 F. Supp. 1044, 1050 (N.D. Ala. 1996).

Defendant attacks plaintiff's proof on the second, fourth, and fifth elements, honing the crucial inquiries in this case to these points:    whether Riels' conduct was unwelcome; whether it was sufficiently severe or pervasive to establish a Title VII violation; and, if so, whether defendant can be held liable for his conduct.

15

### 1.  Unwelcome

In order for conduct to constitute harassment, the conduct must be "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903. Defendant argues plaintiff failed to take any steps toward making it known that Riels' conduct was unwelcome on any occasion. Defendant's argument on this point is without merit.

Plaintiff complained about Riels' conduct to her two immediate supervisors, one of whom took the complaints to the store manager. Yet, nothing was done to address Riels' conduct toward plaintiff, or to transfer her from Riels' shift.  Defendant argues it did not have notice the conduct was unwelcome, because plaintiff did not report the problems to a "member of management."[4]   However, one of plaintiff's immediate supervisors, Gaines, *did* report these problems to the store manager (with no response). Plaintiff also filed a charge with the EEOC, which also demonstrates the conduct was unwelcome.  Plaintiff thus has presented a genuine issue of fact for trial as to whether the conduct was unwelcome.

---

[4] Defendant's Human Resource Bulletin states "[a]ssociates who believe they have been the subject of harassment should promptly report the alleged act to their Manager and/or the Human Resource Department." (Plaintiff's Exhibit 6.) Further, the Defendants' Human Resources Policy reads "Any associate who believes they have been the subject of harassment is responsible for promptly reporting the alleged act to the Human Resources Department or their immediate supervisor." (Plaintiff's Exhibit 7.)

16

## 2. **Severe and pervasive**

Plaintiff must show the conduct was "sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment." *Meritor*, 477 U.S. at 67 , 106 S.Ct. at 2405 (1986) (quoting *Henson*, 682 F.2d at 903-04). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. In evaluating the severity and pervasiveness of the conduct, the court will examine the totality of the circumstances, which includes: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

Defendant views Riels' conduct as isolated individual occurrences. When thus viewed, none of the incidents would amount to a hostile working environment. Viewed in their totality, however, the incidents could be viewed as creating a hostile working environment. According to plaintiff's supervisors, Riels behaved offensively on a daily basis. Riels' termination implies the conduct was unacceptable to defendant.

Moreover, numerous courts hold that physical contact with a person's intimate body areas constitutes unlawful harassment, even

17

if it occurs only once. *See* I B. **Lindemann & P. Grossman,**
*Employment Discrimination Law* 795 n. 240 (3d ed. 1996). As the
EEOC explains,

> unwelcome, intentional touching of a charging party's
> intimate body areas is sufficiently offensive to alter
> the conditions of [the] working environment and
> constitute a violation of Title VII. More so than in the
> case of verbal advances or remarks, a single unwelcome
> physical advance can seriously poison the victim's
> working environment.

EEOC Policy Guidance: Sexual Harassment, N-915.035 (quoted in
*Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840, 844
(2d Cir. 1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1314 (1991),
and in *Stroehmann Bakeries, Inc. v. Local 776, International
Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir.), *cert. denied*,
506 U.S. 1022, 113 S.Ct. 660 (1992)).

Plaintiff alleges that "his [Riels'] front part hit my back
part and he [Riels] said, wow, that was thrilling." That one
allegation, if true, is sufficiently severe to alter the conditions
of plaintiff's employment and create an abusive working
environment. Accordingly, plaintiff has presented a genuine issue
of fact as to whether Riels' conduct was sufficiently "severe or
pervasive" to rise to the level of a Title VII claim under a
sexually hostile work environment theory.

3. **Employer liability**

The Supreme Court recently issued two opinions addressing the
circumstances under which "an employer may be held liable under

18

Title VII ... for the acts of a supervisory employee whose sexual

harassment of subordinates has created a hostile work environment

amounting to employment discrimination." *Faragher v. City of Boca*

*Raton*, __ U.S. __, 118 S.Ct. 2275, 2279 (1998). *See also*

*Burlington Industries, Inc., v. Ellerth*, __ U.S. __, 118 S.Ct. 2257

(1998). Both cases were decided on the same day, and both adopted

the same holding.

> An employer is subject to vicarious liability to a
> victimized employee for an actionable hostile environment
> created by a supervisor with immediate (or successively
> higher) authority over the employee. When no tangible
> employment action is taken, a defending employer may
> raise an affirmative defense to liability or damages,
> subject to proof by a preponderance of the evidence. The
> defenses comprises two necessary elements: (a) that the
> employer exercised reasonable care to prevent and correct
> promptly any sexually harassing behavior, and (b) that
> the plaintiff employee unreasonably failed to take
> advantage of any preventive or corrective opportunities
> provided by the employer or to avoid harm otherwise.

*Faragher*, 118 S.Ct. at 2292-93; *Ellerth*, 118 S.Ct. at 2270. The

Court went further to hold "[n]o affirmative defense is available,

however, when the supervisor's harassment culminates in a tangible

employment action, such as discharge, demotion, or undesirable

reassignment." *Id.* The Court defined "tangible employment action"

as "a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant

change in benefits." *Ellerth*, 118 S.Ct. at 2267.

19

The Fourth Circuit has interpreted this holding to mean that if a supervisor's sexual harassment culminates in a "tangible employment action," then the employer will be held liable for the supervisor's harassment "regardless of whether the employer knew or should have known of the harassment and regardless of whether the employer took remedial steps to end the harassment after learning of it." *Reinhold v. Commonwealth of Virginia*, 1998 WL 440711 (4th Cir. 1998). If the employee has not suffered a "tangible employment action," but a hostile work environment nevertheless exists, the employer is still vicariously liable unless the employer is able to prove the affirmative defense by a preponderance of the evidence. *Id.* at 3. This court agrees with the Fourth Circuit's analysis.

Defendant in the present action argues it did not receive notice of plaintiff's problems with Riels until August 19, 1996. The defendant's sexual harassment policy requires reporting to a member of management. The problem with defendant's argument lies in the fact that plaintiff reported her problems to two different supervisors, one of whom twice relayed plaintiff's complaints to the store manager, who is a member of management. A question of fact exists as to exactly when defendant received notice, in order to determine whether defendant took prompt remedial action.

Applying the Supreme Court's holding to the instant case, defendant should be afforded the opportunity to prove by a

20

preponderance of the evidence the affirmative defense available to it through the *Faragher* and *Ellerth* holdings. Here plaintiff has not alleged she was discharged because she refused the sexual advances of Riels, but that she was discharged in retaliation for filing an EEOC charge. Therefore, the affirmative defense is available to the defendant. Accordingly, defendant's motion for summary judgment as to plaintiff's hostile work environment claim is due to be denied.

## C.  Retaliation

The Eleventh Circuit has held "[t]he burden of proof in Title VII retaliation cases is governed by the framework estabished in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case of retaliation under Title VII, an employee must show:    (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). If a plaintiff establishes a *prima facie* case, then, at the second stage of analysis, the burden of production shifts to defendant to rebut the presumption of intentional discrimination by articulating legitimate, nondiscriminatory reasons for the employment action.    *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253; 101 S.Ct. 1089, 1093; 67 L.Ed.2d 207 (1981). If defendant carries its burden, then plaintiff must have

21

an opportunity to show by a preponderance of the evidence that defendant's stated reasons are merely pretexts for unlawful, discriminatory motives. An employee's opposition to an unlawful employment practice is protected if the employee has a reasonable belief the practice constitutes a violation of Title VII. *EEOC v. White & Son Enterprise*, 881 F.2d 1006, 1012 n.5 (11th Cir. 1989).

Defendant does not contest the first two prongs of the plaintiff's *prima facie* case. Defendant acknowledges plaintiff filed an EEOC charge and she was terminated. Defendant instead argues that plaintiff's retaliation claim must fail because there is "no causal connection between" plaintiff filing an EEOC charge and her termination.

The Eleventh Circuit holds that "[i]n order to establish the requisite 'causal link' required as part of the *prima facie* case, a plaintiff need only establish that 'the protected activity' and the adverse action were not wholly unrelated." *Goldsmith*, 996 F.2d at 1163. (citations omitted). The court went further to state "at a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Id.* Defendant does not attempt to argue it did not know about the EEOC charge at the time plaintiff was terminated. Rather, defendant bases its argument on the length of time that elapsed between the filing of the EEOC charge and plaintiff's termination, which was roughly two months. According

22

to defendant, the length of time between the two actions alone is enough to defeat plaintiff's *prima facie* case.

Defendant further argues that even if plaintiff establishes a *prima facie* case, it can rebut the presumption of intentional discrimination by offering legitimate nondiscriminatory reasons for plaintiff's termination.    Defendant argues the plaintiff's termination resulted from her receiving two progressive counseling forms, based on her alleged violations of company policy. Defendant points to the fact that plaintiff could have been terminated after receiving her first progressive counseling form. Defendant's reasons for termination sustain its burden of production and thereby rebut the presumption of intentional discrimination.

Finally, plaintiff must demonstrate defendant's stated reasons are merely pretext for unlawful, discriminatory motives. Plaintiff has presented evidence showing that other employees and managers rang up their own purchases at the store without receiving a progressive counseling form or terminated. (Taylor Deposition at 31.)    This evidence is in direct contradiction to one of defendant's reasons for terminating plaintiff. Plaintiff has also presented evidence that her store manager, Harder, began making up untrue problems with plaintiff in order to have her fired after she complained of the harassment by Riels and filed an EEOC charge. (*Id.* at 33-37.)    Thus, plaintiff has met her burden of proving the

23

reason given by defendant for her termination are merely pretext for discriminatory motive.  Accordingly, defendant's motion for summary judgment as to the retaliation claim is due to be denied.

## D.   Negligent Supervision and Retention

Plaintiff's last claim is based on the state law of negligent supervision and retention.  In order to avoid a summary judgment on a negligent supervision claim, plaintiff must show "by affirmative proof that [the employee]'s alleged incompetence was actually known to [the employer] or was discoverable by [the employer] if it had exercised care and proper diligence."  *Ledbetter v. United American Insurance Co.*, 624 So. 2d 1371, 1373 (Ala. 1993).  The lack of prior complaints of sexual harassment was recently viewed as evidence the employer did not know of the employee's incompetence. *See Portera v. Winn Dixie of Montgomery*, Inc., 996 F. Supp. 1418 (M.D. Ala. 1998).  Defendant in the instant action has presented evidence supporting the argument it had no notice of any complaints against Riels until August 19, 1996, when the regional human resource manager became aware of plaintiff's problems.  Defendant also presented evidence plaintiff had spoken to the human resource department on two different occasion in July of 1996 without mentioning her problems with Riels.  Further evidence shows once defendant allegedly received notice the entire investigation and termination of Riels took eleven days, from August 19 through August 30, 1996.

24

Nevertheless, plaintiff has brought forth evidence which contracts defendant's proof of no notice. Defendant's human resource policy and bulletin require possible harassment be reported either to the employee's manager, immediate supervisor, or the human resource department.[5] Plaintiff presented evidence, she voiced complaints about Riels to both of her immediate supervisors, Gaines and Taylor. Gaines, in turn, twice reported the plaintiff's problems to the store manager. According to defendant's own harassment policy, notification to a manager or immediate supervisor places defendant on notice of the problem. Further evidence shows defendant began to take remedial action only after plaintiff complained to the another assistant store manager, Mills.

Thus a question of fact exists as to when defendant received notice, which in turn effects the determination of whether defendant negligently supervised its own employees. Accordingly, defendant's motion for summary judgment as to the negligent supervision claim is due to be denied.

### III. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS AMENDED

With regard to the plaintiff's motion for partial summary judgment and amended motion for partial summary as to liability under Title VII only, this court finds that plaintiff has failed to produce sufficient evidence establishing as a matter of law

---

[5] See supra note 4.

25

defendant should be held liable under Title VII.  Therefore, the
plaintiff's motions are due to be denied.

### IV. DEFENDANT'S MOTION TO STRIKE

Regarding  defendant's  motion  to  strike  excerpts  from
consideration of plaintiff's motion for summary judgment and any
response of plaintiff to defendant's motion for summary judgment,
this court did not consider the first and second excerpts for the
pending motions. The court did consider the third excerpt in
evaluating the plaintiff's claims.  Accordingly, the defendant's
motion is due to be granted as to the first and second excerpts and
denied for the third excerpt.

An appropriate order in conformity with this memorandum
opinion will be issued contemporaneously herewith.

DONE this __/8t__ day of September, 1998.

United States District Judge

26